UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BLAKE SIMPKINS, ADDISON
SIMPKINS and ANDREA JENKINS,

    Plaintiffs,

                                                Case No. 23-10184

v.

                                                Hon. Denise Page Hood

FERNDALE-F, LLC d/b/a
SUBURBAN FORD OF FERNDALE,

    Defendant.

_____/

**<u>ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (#46)
AND
DISMISSING ACTION</u>**

**I.    BACKGROUND**

On January 24, 2023, Plaintiffs Blake Simpkins (Blake), Addison Simpkins (Addison) and Andrea Jenkins (Jenkins) filed a Complaint, which was amended on March 10, 2023. ECF Nos. 1, 12. The Amended Complaint against Defendant Ferndale-F, LLC d/b/a Suburban Ford of Ferndale (Defendant) alleges Race Discrimination in the Making of a Contract in Violation of 42 U.S.C. § 1981 (Count I) and Race Discrimination in Violation of Michigan's Elliott-Larsen Civil Rights Act (Count II). ECF No. 12. Plaintiffs are Black. *Id*. at PageID.43.

Defendant's General Manager at the time of the event at issue was Patrick

Klein (Klein). Before COVID-19 pandemic, Defendant established safeguards for certain vehicles when customers asked to test drive a vehicle. Exotic cars, such as Mustang Cobras or Shelbys were not allowed to be test driven. ECF No. 46, Ex. C at 89. As to other expensive vehicles, a salesperson was mandated to accompany the customer on the test drive. ECF No. 46, Ex. D at 87, 40-42. After COVID, Defendant changed its test drive policy and beginning in April 2020 through the summer of 2022, Defendant prohibited salespeople from riding with customers. *Id.* at 86. Klein decided to change the COVID-19 test drive policy as to pre-owned performance vehicles over $50,000. *Id*. Customers would be able to test drive these vehicles with an approved credit application, or access to credit to secure the purchase price, or showing access or proof to unencumbered funds for potential cash sales. *Id*. at 83, 85.

Blake and Addison are twin brothers. At the time of the incident, they were 20 years of age. ECF No. 51, Ex. A, at 8-9. Jenkins is their mother's best friend, considered by the twins as an aunt. Jenkins' late husband, Derrick considered the twins as his nephews. *Id*. at 9. The twins are car enthusiasts and frequently assist friends and family in researching and acquiring vehicles. ECF No. 51, Ex. B, at 34-35. The Jenkins owned seven vehicles, most of them high-end or luxury vehicles. ECF No. 51, Ex. C, at 13. The twins assisted the Jenkins in the

purchase of five of those vehicles. *Id*. at 19. The twins researched various vehicles for Jenkins, including the maintenance the cars would require, and accompanied Jenkins to various dealerships to look at cars, inspect them and test drive them before she purchased the cars. *Id*. at 19.

Jenkins wanted to upgrade her 2018 Audi Q7 in May 2022 and asked the twins to help her look for a car. The twins recommended a 2021 Audi SQ7, which Blake found online for sale by Defendant. *Id*. at Ex. B, 51-52. The 2021 Audi was listed for $87,000. *Id*. at Ex. B. Defendant also listed three other vehicles which Blake thought could be alternatives to the 2021 Audi, including a 2017 Porsche Cayenne for $54,000, a 2017 Land Rover Range Rover LWB at $54,000 and a Cadillac Escalade. *Id*. at Ex. B, 52, 79, 123. Blake submitted an online inquiry to Defendant about the 2021 Audi. *Id*. at 53-54. Defendant's sales assistant, Joshua Arcos, followed up Blake's online inquiry. *Id*. at 55-57; Ex. E. Blake scheduled an appointment with Arcos for a test drive of the 2021 Audi for May 12, 2022. *Id*.; Ex. F. Arcos did not tell Blake that documentation was required to test drive the 2021 Audi. *Id*.

Around 10:00 p.m. on May 12, 2022, Plaintiffs left New Jersey to drive approximately 600 miles overnight to Ferndale, Michigan to obtain the 2021 Audi. *Id*. at 61-63. Jenkins was prepared to purchase the 2021 Audi if the test drive

presented no defects. She was prepared to trade-in her 2018 Audi, which they drove to Michigan. ECF No. 51, Ex. C at 46-49.

Plaintiffs met with sales representative Anthony Charles telling him they were interested in test driving the 2021 Audi, in addition to the Porsche Cayenne, Range Rover and Cadillac Escalade. ECF No. 51, Ex. B at 68-69, 123. Charles asked to see a driver's license and Jenkins provided her New Jersey license. *Id*. at 70. After scanning the license, Charles brought the 2021 around to the side of the dealership. *Id*. at 74-75. Plaintiffs looked inside the vehicle and then asked Charles if they could take it for a test drive. Charles responded that they could not take the car for a test drive. *Id*. at 76. Plaintiffs asked Charles if he could ride with them as they drove the car or if Charles could drive the car with Plaintiffs as passengers. Charles indicated no, telling them that "this is Detroit, people steal cars." ECF No. 51, Ex. A at 43. Charles told Plaintiffs that in order to test drive vehicles over $50,000, a cashier's check in the amount of the vehicle or a credit application was required. ECF No. 51, Ex. B at 77. Charles indicated that this applied to all the vehicles Plaintiffs were interested in since they were all over $50,000. *Id*. at 79. Jenkins indicated that she planned to buy the vehicle in cash, offering to put down a down payment of $20,000 on her credit card, but Charles refused to allow Jenkins to drive the vehicle. *Id*., Ex. C at 35-36.

4

Jenkins then had her 2018 Audi appraised, which they thought would be at $40,000. The appraisal came in at $36,000. *Id*., Ex. B, at 88. Blake told Charles he thought the appraisal was low, but Charles responded that they did not negotiate on appraisal values. *Id*. The twins brought the appraisal to Jenkins and told her they thought the number was unfair and left the dealership. *Id*., Ex. C at 43. They went to a nearby restaurant and discussed their experience, which shocked, dismayed and disappointed them. *Id*. at 44.

Charles later called Plaintiffs and told them that Defendant was willing to discount the vehicle and provide Jenkins more for the trade in. ECF No. 46, Ex. C at 142. Jenkins was not satisfied with the price and declined to enter into a purchase agreement for the vehicle according to Charles. *Id*. Jenkins testified that she was not buying a car unless she test drove it. ECF No. 51, Ex. C at 40. The new appraisal for the 2018 Audi for $39,000. ECF No. 51, Ex. B at 108. However, Jenkins indicated that even if Defendant came with a better offer, she was not buying the car unless she test drove it. *Id*. at 46. Blake went back to the dealership for a corrected appraisal sheet. *Id*. at 109; *Id*., Ex. I.

Blake called another Suburban Collection dealership to inquire about test driving an Escalade listed for sale for $80,000. He was told a driver's license and proof of insurance to test drive and that a cashier's check or a credit application

5

was required in order to test drive the car. *Id*., Ex. B at 164-65. Plaintiffs then returned to New Jersey. *Id*. Jenkins stated that she was ready to go home because she did not like the way they were treated. She further stated that all the cars she bought she had test driven. *Id*., Ex. C at 48.

Blake emailed Charles stating that his uncle was thinking about test driving a car and was told in a May 17, 2022 email that a cashier's check or a credit approval was required for a test drive. *Id*., Ex. J, Ex. K. The twins then asked a friends' father, David Brywka, who is Caucasian, to visit the dealership, which he did on June 3, 2022. *Id*., Ex. L at 28. Brywka asked to test drive the 2021 Audi Plaintiffs had looked at but was unable to do so because the car was being sold. *Id*. at 35-36. Brywka asked the salesperson Chris Marhofer about other used, high-end cars. *Id*. at 37. Marhofer showed Brywka the 2017 Porsche Cayenne for $54,000, the same car Plaintiffs were also interested in. *Id*. at 38. Brywka asked what was required to test drive the car and Marhofer indicated only a driver's license. *Id*. at 39-40. Brywka also asked Marhofer if he would ride with Brywka and Marhofer agreed. *Id*. at 50.

Plaintiffs thereafter filed the instant lawsuit against Defendant. This matter is now before the Court on Defendant's Motion for Summary Judgment. A response and reply have been filed and a hearing held on the matter.

6

## II. ANALYSIS

### A. Standard of Review

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

### B. 42 U.S.C. § 1981

Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts with both public and private actors. 42 U.S.C. § 1981. The statute's protection extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id*. § 1981(b). A plaintiff must initially plead and ultimately prove in a § 1981 claim that but for race, it would not have suffered the loss of a legally protected right. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020) To prevail in a claim of race discrimination under § 1981 relying on circumstantial evidence, a plaintiff must meet the burden-shifting standard of proof for Title VII cases established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir.1999); *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 61 (6th Cir.1991). Under this standard, a plaintiff must first establish

a prima facie case of discrimination by a preponderance of the evidence.

A prima facie § 1981 commercial establishment case, a plaintiff must prove: (1) plaintiff is a member of a protected class; (2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and (3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory. *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872-73 (6th Cir.), opinion supplemented on denial of reh'g, 266 F.3d 407 (6th Cir. 2001).

The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. To prevail, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reason is not its true reason but a pretext for discrimination. *Burdine*, 450 U.S. at 253; *Christian*, 252 F.3d at 867–68.

Plaintiffs have met the first factor–members of a protected class–since they are Black. As to the second factor–Plaintiffs cannot show that they sought to make or enforce a contract for services ordinarily provided by the defendant.

9

Defendant argues that Jenkins terminated the negotiations because the counteroffer was not sufficient, and Plaintiff were the ones that left to go home. Jenkins testified that even if the counteroffer was lower, she would not purchase the vehicle unless she was able to test drive the car. The services ordinarily provided by Defendant is to enter into purchase agreements of vehicles. Plaintiffs have not shown that they could not have made a contract to enter into a purchase agreement with Defendant. The parties testified that after Defendant made its initial offer of a lower trade in value of Jenkins' 2018 Audi, Defendant made a second offer with a higher trade in value. This shows that Defendant was willing to enter into a purchase agreement with Plaintiffs by negotiating the value of the proposed trade-in vehicle. Plaintiffs argue that because they were prevented from test driving the vehicle, they were unable to make a contract with Defendant. However, test driving a vehicle is not the "contract for services" Defendant ordinarily provides. The "contract for services," which is the reason Plaintiffs came to the dealership, was to enter into a purchase agreement for a vehicle. Defendant does not provide "contract for services" to test drive a vehicle. Plaintiffs may have suffered the indignities of not being able to test drive a vehicle, however, given that Defendant reached out to Plaintiffs to offer a higher trade in value for Jenkins' car and with willingness to negotiate the price of the vehicle,

Plaintiffs were not denied to make a contract for the services of entering into a purchase agreement with Defendant.

Regarding the third factor that plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that plaintiff was deprived of services while similarly situated persons outside the protected class were not, Plaintiffs may have shown that a similarly situated White person may have been able to test drive a vehicle, Plaintiffs have not shown that they were deprived of entering into a purchase agreement with Defendant while a White person was able to enter into a contractual relationship with Defendant. There is no showing that the White person entered into a contractual relationship with Defendant. All the evidence submitted by Plaintiffs is that the White person went to the dealership and asked to test drive a vehicle. Plaintiffs have not shown that the White person was similarly situated to Plaintiffs because they have not submitted evidence that the White person attempted to enter into a purchase agreement with Defendant; Plaintiffs have only shown that the White person may have been able to test drive a vehicle, although ultimately it does not appear that the White person actually test drove a vehicle. In addition, the White person did not meet with the same salesperson as Plaintiffs. The proposed comparator is not similarly situated as Plaintiffs. Plaintiffs are unable to meet the prima facie case

of intentional discrimination under § 1981.

If Plaintiffs were able to meet a prima facie case, the burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. Defendant's reason for not allowing Plaintiffs to test drive the car was due to COVID-19 policies, which is legitimate.  Defendant also claims that it did not enter into a purchase agreement with Plaintiffs because Jenkins terminated the negotiations and did not accept its offer of a higher trade in value for her car and perhaps a lower price on the to be purchased vehicle.  Plaintiffs are unable to prove by a preponderance of the evidence that Defendant's proffered reason for not entering into a purchase agreement with Jenkins is not its true reason but a pretext for discrimination since the evidence shows Defendant was willing to negotiate with Jenkins to enter into a purchase agreement.

Based on the above and the record, Plaintiffs cannot ultimately prove in their § 1981 claim that but for their race, they would not have suffered the loss of a legally protected right–to enter into a purchase agreement with Defendant.  Even if Plaintiffs may have shown that they were unable to test drive a vehicle because of their race, they have not shown that they were unable to enter into a purchase agreement with Defendant because of their race.

### C. Elliott-Larsen

The ELCRA provides that employers shall not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." Mich. Comp. Laws § 37.2202(1)(a). Under the ELCRA, a plaintiff must show that his or her national origin was "a motivating factor" in the decision to take the adverse action. *See Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520, 522 (Mich. 2001); *see also Patel v. Trinity Health Corp.*, No. 20-10517, 2021 WL 4894637, at *9 (E.D. Mich. Oct. 20, 2021) (noting that if a plaintiff cannot meet the "motivating factor" standard under ELCRA, he or she cannot show but-for causation for a § 1981 claim). Section 1981 and ELCRA are analyzed under the same framework. *See Thompson v. City of Lansing*, 410 F. App'x 922, 934 (6th Cir. 2011); *Jackson*, 191 F.3d at 658; *Antunes v. Gerdau Macsteel, Inc*, No. 20-10724, 2022 WL 3647801, at *12–13 (E.D. Mich. Aug. 24, 2022), aff'd sub nom. *Antunes v. Gerdau MacSteel, Inc*., No. 22-1805, 2023 WL 3479401 (6th Cir. May 16, 2023).

In light of the analysis set forth above as to the § 1981 claim, Plaintiffs are also unable to establish a claim under the ELCRA.

13

## III. CONCLUSION/ORDER

For the reasons set forth above,

IT IS ORDERED that Defendant's Motion for Summary Judgment (ECF No. 46) is GRANTED.

IT IS FURTHER ORDERED that this action is DISMISSED with prejudice and designated as CLOSED on the Court's docket.

s/Denise Page Hood<br>
DENISE PAGE HOOD<br>
United States District Judge

DATED:   September 30, 2024